# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DIVISION OF TENNESSEE
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| | * | |
| | * | |
| **JULIA GREER and CARRIE MOORE** | * | |
| | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | **No.** |
| **v.** | * | **JURY DEMAND** |
| | * | |
| **HOME REALTY COMPANY** | * | |
| **OF MEMPHIS, INC., HOME** | * | |
| **FINANCIAL SERVICES OF** | * | |
| **MEMPHIS, INC., YALE** | * | |
| **MORTGATE CORPORATION,** | * | |
| **CHARLES E. MOORE,** | * | |
| **DAVID MOORE, AND** | * | |
| **LAWRENCE W. KERN,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

## COMPLAINT

COME NOW the Plaintiffs, Julia Greer and Carrie Moore, by and through undersigned counsel, and in support of their claim for relief against Defendants, state the following:

### I. NATURE OF THE CASE

1.      This is an action for damages and equitable relief, arising under the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. Additionally, the action includes claims under the Fair Housing Act, the Truth in Lending Act, the Real Estate Settlement Procedures Act, the Equal Credit Opportunity Act, the Tennessee Consumer Protection Act, the Tennessee Home Loan Protection Act of 2006,

fraud, conversion, negligent misrepresentation, breach of fiduciary duty, unconscionability and conspiracy to commit some or all of the aforementioned torts. All aforementioned acts constitute predatory lending practices and a predatory lending scheme by defendants.

2.      The defendants acted in concert, preying on unsuspecting and unsophisticated consumers and homeowners, particularly African-Americans, by luring them into exploitative mortgage loans, ostensibly to finance home repairs and/or home improvement work.  However, some of the defendants aimed to obtain the homes with substantial equity, through foreclosure in addition to collecting excessive fees and charges.

3.      Two of the defendants, one, a self-proclaimed real estate, investment advisory service in the business of buying homes, and the other, a mortgage company, are housed in the same office and are owned and operated by the same people.  These defendants provide exorbitant short term loans on houses that are worth substantial amounts and have significant equity; they maintain control of the large home improvement funds and foreclose on the properties if the homeowner is unwilling to refinance into a loan with even more unconscionable terms to another lender that specializes in making equity-based loans. The defendants attached outrageous fees and charges to the loan on the front end and a substantial fee or penalty on the back end if the initial loan is not refinanced through an affiliate lender so that they can collect even more fees and charges. These defendants made high-cost loans, knowing that the borrowers would not be able to repay the loans.  Upon information and belief,  the ultimate goal was

to obtain the property in foreclosure at a fraction of the value of the home, and then either rent or sell the home for profit, leaving the borrower and/or homeowner homeless.

4.      The Plaintiffs here sought a modest loan to have some repairs done to the house.  Instead, one Plaintiff, Carrie Moore, was required to quitclaim the property to another Plaintiff, Julia Greer, who ended up with a loan with a balloon note maturing in six months, a high interest rate, and exorbitant fees. The Plaintiffs are now faced with the loss of their home and substantial equity through a foreclosure sale scheduled for October 9, 2007.

5.      The defendants participate in this enterprise by fraudulently signing documents, and systematically deceiving the Plaintiffs about the nature and terms of the transaction.   Some of the defendants actually retained most of the loan proceeds and exercised complete control and dominion over the funds that they ostensibly loaned to Julia Greer, making improvements on a home they fully expect to acquire through foreclosure.

## II. <u>JURISDICTION</u>

6.      This Action is brought pursuant to the provisions of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., Fair Housing Act, 42 U.S.C. §§ 3601 et seq., the Truth-in-Lending Act 15 U.S.C. § 1601 et seq., and the Equal Credit Opportunity Act, 15 U.S.C. § 1331 et seq. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331, with resulting jurisdiction over Plaintiffs state law claims pursuant to 28 U.S.C. § 1367.

## III. VENUE

7.        Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) in that

Plaintiff and all Defendants reside or do business in this district and/or a substantial part,

if not all, of the events or omissions giving rise to the claim occurred in this district.

Venue is also proper in this district pursuant to 18 U.S.C. § 1965(a) in that all parties

reside, are found, have an agent, and/or transact his/her/it's affairs in this district.

## IV. PARTIES

8.        Plaintiff Julia Greer (hereinafter "Ms. Greer") is an adult resident citizen

of Memphis, Shelby County Tennessee and currently resides in a home she also rents at

550 Techno Lane, Memphis, Tennessee 38106.

9.        Plaintiff Carrie Moore is an adult resident citizen of Memphis, Shelby

County Tennessee and currently resides at 1020 Chambliss, Memphis, Tennessee 38117.

10.        Defendant Home Realty Company of Memphis, Inc., d/b/a Home Realty

Financial and Home Financial Services of Memphis, Inc.  (hereinafter "Home Realty") is

a Tennessee Corporation duly registered to transact business in Tennessee. Its principal

place of business is 3412 Park Avenue, Memphis, Tennessee 38111. Its registered agent

for service of process is Charles E. Moore, 3412 Park Avenue, Memphis, Tennessee

38111.

11.        Defendant Home Financial Services of Memphis, Inc., d/b/a Home Realty

Company of Memphis and Home Financial Services of Memphis, Inc. (hereinafter

"Home Financial") is a Tennessee Corporation duly registered to transact business in

Tennessee. Its principal place of business is 3412 Park Avenue, Memphis, Tennessee

38111. Its registered agent for service of process is Charles E. Moore, 3412 Park Avenue, Memphis, Tennessee 38111.  Home Financial is engaged in the practice of mortgage lending but is not licensed by the Tennessee Department of Financial Institutions, in violation of the Tennessee Residential Lending, Brokerage and Servicing Act of 1988, Tenn. Code Ann. §45-13-101 et seq.

12.      Defendant Yale Mortgage Corporation (hereinafter "Yale Mortgage") is a foreign corporation duly registered to transact business in Tennessee. Its principal place of business is 4100 N.E. 2nd Avenue, Suite 206, Miami, Florida 33137. Its registered agent for service of process is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203.

13.      Defendant Charles E. Moore is an adult citizen of Bartlett, Tennessee. Upon information and belief, he currently resides at 8917 Clair Douwie Cove, Bartlett, Tennessee 38133. Upon information and belief, he is the founder and principal shareholder of Home Realty and Home Financial and actively controls the day to day operations of both businesses.

14.      Defendant David Moore is an adult citizen of Memphis, Shelby County Tennessee. Upon information and belief he is a shareholder and employee of Home Realty and Home Financial, both Tennessee Corporations duly registered to transact business in Tennessee. Its principal place of business is 3412 Park Avenue, Memphis, Tennessee 38111.

15.      Defendant Lawrence W. Kern (hereinafter "Kern") is a licensed Tennessee attorney and an adult citizen of Germantown, Tennessee. Upon information and belief, he currently resides at 8519 Sweet Oaks Cove, Germantown, Tennessee 38138. Upon

information and belief Mr. Kern routinely performs closings for Home Financial and

Home Realty and routinely serves as Trustee on Deeds of Trust executed between those

companies and consumers like the Plaintiffs often foreclosing on the properties

mortgaged in connection with the transaction.

### V. <u>JURY DEMAND</u>

16.        Plaintiffs invoke their right to a trial by jury as provided for in 42 U.S.C. §

1981a(c)(1).

### VI. <u>FACTUAL STATEMENT</u>

17.        Plaintiff Julia Greer (hereinafter "Ms. Greer") is a sixty-eight year old

African-American woman.

18.        Ms. Greer is unsophisticated in matters relating to home mortgage loans.

She has a tenth-grade education, and worked as a grill-cook most of her life.

19.        She has never owned a home prior to the events giving rise to this

litigation.

20.        Ms. Greer's only income is $814.00 per month in Social Security

Retirement benefits.

21.        Carrie Moore and Betty Moore are sisters.  They are African-American

women in their sixties.  The Moore sisters are cousins of Julia Greer.

22.        The Moore sisters bought a home at 1020 Chambliss in Memphis

Tennessee  for $62,405.00 in 1988.

23.        In October of 2004, the title to the home at 1020 Chambliss was quitclaimed from Betty Moore to Carrie Moore.

24.        In 2007, the Shelby County Tax Assessor appraised the value of the house located at 1020 Chambliss to be $96,200.

25.        Carrie Moore has lived in the house at 1020 Chambliss from 1988 until the present, except for several months in 2007, when she lived with her daughter while some repairs, which are the subject of this lawsuit, were being done to the home.

26.        Carrie Moore is 65 years old, and has been in poor health; she suffered her first disabling stroke fifteen years ago and has had a subsequent stroke. She is incapable of living independently.

27.        Carrie Moore completed tenth grade and is an unsophisticated consumer in matters relating to mortgages and loans. Moreover, her cognitive ability appears to have been significantly diminished by the strokes she has suffered.

28.        Betty Moore completed high school but is also an unsophisticated consumer in  matters relating to mortgages and loans.

29.         As of January 2007, the original mortgage had been paid off and the house was unencumbered. Although the 2,300 square foot house had considerable value, it had fallen into bad condition and it needed repairs

30.        Carrie Moore lives on a fixed income of $615.00 in Social Security benefits.

31.        Although Ms. Greer did not live in the property, Ms. Greer agreed to help her cousin obtain a loan to repair and fix, among other things, black mold in the master bedroom, a hole in the roof and floors that were rotted out.

32.     Carrie Moore and Ms. Greer intended that once the repairs were completed and her current lease expired, Ms. Greer would move into the house, they would jointly pay the home improvement loan, and Ms. Greer would help care for Ms. Moore.

33.     The lease at Ms. Greer's residence expires in December 2007, and it was her plan to move into the house on Chambliss after the expiration of the lease.

34.     The Plaintiffs, particularly Julia Greer, made several unsuccessful attempts to get a home improvement loan.

35.     An acquaintance of Julia Greer's daughter, Linda Greer, suggested that they speak to Defendant Home Realty about getting a home repair loan for the property.

36.     Towards the end of March 2007, Julia Greer telephoned Home Realty and spoke with Defendant Charles Moore about obtaining a home repair loan.

37.     Upon information and belief, Charles Moore visited the property prior to meeting the Greers, obtaining entrance by Carrie Moore, inspected the property and took pictures of the interior and exterior of the house.

38.     On March 28, 2007, Ms. Greer and her daughter, Linda Greer, went to Home Realty's office at 3412 Park Avenue, Memphis, Tennessee 38111, in order to meet with David Moore, and discuss financing the home repairs.

39.     At this meeting, a $20.00 credit check fee, as well as a $200.00 title search fee was paid to Home Realty Company. Ms. Greer was not asked about her income, or to fill out any forms or a loan application.

40.      Home Realty Company is in the business of "buying homes" and is a self-proclaimed "Real Estate, Investment Advisory Service", while Home Financial is in the business of making and brokering home loans.

41.      On or about April 2007, David Moore told Julia Greer that Home Realty was willing to give her a loan, but that Carrie Moore and Betty Moore would have to quitclaim their interests in the property to her.

42.      David Moore asked that Carrie and Betty Moore come to a closing which was to be held at Lawrence Kern's law offices, located at 5118 Park Avenue, Memphis, Tennessee 38117.

43.      No loan documents were forwarded to Julia Greer prior to closing as required by applicable law.

44.      On April 3, 2007, Julia Greer, her daughter Linda Greer, Carrie Moore and Betty Moore went to Lawrence Kern's office in order to close on the loan.

45.      They were met by Defendant Lawrence Kern, who identified himself as the closing attorney.

46.      Kern informed them that the quitclaim deed transferring title from Betty Moore to Carrie Moore that had been executed in October 2004, was defective and that a new quitclaim deed had been prepared and needed to be executed.  Kern instructed Betty Moore and Carrie Moore to sign a quitclaim deed he had prepared for the purpose of transferring their interests in the property to Julia Greer.  After signing the quitclaim deed, Kern told Betty Moore and Carrie Moore to leave.

47.      Julia Greer, Linda Greer, and Lawrence Kern remained present for the closing for the loan.

48.     Ms. Greer saw the closing documents for the first time at the Mr. Kern's office. She was rushed through the closing by Kern.  He flipped through the stack of documents quickly, asking her to "sign here, sign here."

49.     Unknown to her at the time, the loan that Ms. Greer executed was a six month interest-only loan for fifty thousand ($50,000.00) with an Annual Percentage Rate of fifteen percent (15%).

50.     Julia Greer was not informed at the closing or prior to it that the loan called for six-hundred-eighty-seven dollars and fifty cent ($687.50) monthly payments, and that the principal balance would not be reduced by the monthly payment.

51.     Unknown to Ms. Greer, the promissory note also contains a provision that an additional fee of two thousand dollars ($2,000.00) would be owed at the end of end of the loan if the loan were not refinanced by Home Financial.

52.     The monthly payment is eighty-four percent (84%) of Ms. Greer's monthly Social Security income of $814.00. This violates the provisions of the Tennessee Home Loan Protection Act of 2006.

53.     The initial loan was for fifty thousand dollars ($50,000), with six interest-only payments and a balloon payment of $50,000 due in six months time on November 1, 2007.  Ms. Greer had no knowledge of the balloon payment.  This balloon payment violates the provisions of the Tennessee Home Loan Protection Act of 2006.

54.     The Settlement Statement shows that of the $50,000 loan proceeds, $37,667.77 was placed in an escrow account for the home repairs, $4,497.22 was paid in City and County taxes, and the remaining $7835.01 was used to pay costs and fees associated with the loan.

55.      The costs and fees associated with the loan are in excess of fifteen percent (15%) of the principal amount of the loan.

56.      The "HUD-1" Settlement Statement shows settlement charges and fees as follows: a loan origination fee of $2,500.00 to Home Financial, and an additional $2,500.00 loan discount fee to Home Realty. Together these fees alone of $5,000 constitute 10% of the total loan amount.

57.      All of these fee were financed through the loan proceeds, which violates the provision of the Tennessee Home Loan Protection Act of 2006, which prohibits lenders from financing points and fees in excess of three percent (3%) of the loan amount in loans of $30,000 or more.

58.      The HUD-1 shows a title search fee of $287.50 paid to Stewart Title at closing, although Ms. Greer had paid Home Realty $200.00 prior to closing, ostensibly for a title search.  The HUD-1 does not show the $200.00 paid by Ms. Greer prior to closing.

59.      The Note states that Ms. Greer will be in default of the loan if "the lender believes in good faith that the borrower may not be willing or able to pay as promised," which directly contravenes the provisions of the Tennessee Home Loan Protection Act of 2006, found at Tenn. Code Ann. §45-20-103 et. seq.,

60.      The loan was made without regard to the borrower's ability to repay, in violation of federal Homeownership Equity Protection Act and the Tennessee Home Loan Protection Act of 2006.

61.      After seeing the HUD-1 during the closing, Linda Greer questioned Kern about the closing costs being in excess of 10% of the loan amount. Mr. Kern assured her

and Ms. Greer that the closing costs were in order and that many of the fees were for separate services. He assured them that the fees were part of the closing costs. After the exchange, Mr. Kern would not allow Linda Greer to view any more of the closing documents.

62.     The HUD-1 shows that Mr. Kern was paid $200.00 as a closing fee, $75.00 for a title examination, $200.00 for document preparation, $15.00 for notary fees, and $100.00 for the Quit Claim Deed. The HUD-1 also shows that, in addition to the $287.50 title search fee, a title insurance premium of $370.00 was paid to Stewart Title Company. Upon information and belief, a substantial portion of those fees were also retained by Lawrence Kern.

63.     In addition to being rushed through the process, Ms. Greer was not provided a Truth-in-Lending Disclosure Statement at closing.

64.     Ms. Greer was not provided a 12-point bold face warning that  she was about to enter a high-cost loan, which may be disadvantageous to her, in violation of the Tennessee Home Loan Protection Act of 2006.

65.     After leaving the closing, Julia Greer, Linda Greer, Betty Moore and her daughter examined the loan documents closely. Only then did they realize some of the outrageous terms and conditions of the loan.

66.     On the afternoon of loan closing, April 3, 2007,  Julia Greer contacted Kern, and informed him that she wanted to cancel the loan.

67.     Kern informed her that in order to rescind the loan she would have to reimburse Kern, Home Realty, and Home Financial for the loan closing costs. He told Ms. Greer that she would have to pay about $13,000 to cancel the loan, in spite of the fact

that no loan proceeds should have been disbursed prior to the expiration of the three-day rescission period provided for in federal law.

68.     Kern also told Ms. Greer that it would be necessary to pay the sum by the next day,  April 4, 2007.  This appears to be an obvious attempt to discourage Ms. Greer from exercising her right to rescind the transaction provided for in the Truth in Lending Act.

69.     Julia Greer also contacted David Moore, within hours of the closing on April 3, 2007, and informed him that she would like to exercise her right of rescission. David Moore told her that checks had already been mailed for the payment of taxes, and that she would have to pay Home Realty $24,200.36, in order to cancel the loan.

70.     As an unsophisticated consumer, Ms. Greer believed both Kern and David Moore that she had to immediately pay substantial sums of money, which she did not have access to, in order to cancel the loan.

71.     Ms. Greer was not informed by Kern or David Moore when she called, that the rescission had to be requested in writing.

72.     Julia Greer and her daughter did make numerous efforts, immediately after the signing of the loan documents, to get help in getting out of the loan transaction, including contacting the Tennessee Department of Financial Institutions, and the Better Business Bureau.

73.     To date, Ms. Greer has paid interest of $88.10 on May 22, 2007, but has not been given any documentation or statements showing the amount of her monthly payments. She has made no monthly payments to Home Realty or any other entity. No demands for payment have been made. Upon information and belief, either the interest

payments were taken from the escrow account by Charles and David Moore or they planned to repay themselves with a new long-term loan.  In fact, a new loan proffered to Ms. Greer by Charles and David Moore contained a loan payoff to Home Realty that was $8,500 more than the principal indebtedness of the first loan.   It is believed that some of the additional payment to Home Realty included $4,037.10 in interest payments of the original loan.

74.     Having been foiled in her attempt to rescind the loan, Ms. Greer attempted to make the best of a bad situation.  Soon after the closing, Ms. Greer obtained estimates on the roofing work that needed to be done on the property. She received bids of $10,000, $7,800 and $6,000.  She wanted to accept the bid for $6000 and contacted Home Realty to get the funds for the escrow account.  However,  David Moore wanted to accept the high bid of $10,000.

75.     This became the first of many disputes between the Greers and Charles and David Moore regarding the use of the escrowed loan proceeds, with the Moores asserting control over the use of the loan proceeds and attempting to determine and control the contractors and workers that were used to make the home repairs.  Many of these disputes seemed to relate primarily to the race of the contractors.

76.     Each time they received bids from contractors, Ms. Greer had to go to the Moore's offices on Park Avenue to "submit" the bids and see which one David Moore would accept.

77.     During one of these visits, David Moore accused Ms. Greer of getting a "kickback" from the contractors and called her a "dumb nigger".  He told her that she

"blame(s) white people for slavery but it was your own people that should be blamed."
During his tirade, he also characterized African-Americans as "welfare recipients."

78.     At all times Home Realty controlled the escrowed proceeds of the loan.
Ms. Greer was forced to purchase materials for the home repairs out of pocket and submit
the receipts to Home Realty. Charles Moore or David Moore would then decide whether
or not to reimburse Ms. Greer for those expenses from her own loan proceeds.  Linda
Greer typically charged these purchased materials on a Home Depot credit card and, as a
result of Moore's arbitrary refusal to "approve" the purchases, Linda Greer was not
reimbursed for approximately five to seven thousand dollars of expenses.

79.     Ms. Greer procured bids from various contractors to perform work on the
property.  On several occasions Charles Moore refused to issue payments to these
contractors.

80.     Ms. Greer was required to turn in work receipts for these contractors.
After these receipts were submitted to Home Realty, David Moore or Charles Moore
would "inspect" the property and decide whether or not to pay the bill.

81.     Ms. Greer was charged an inspection fee of $75.00 for each of these visits;
these fees were taken from the escrowed loan proceeds.  Charles and David Moore took
at least $225.00 from loan proceeds for these inspections.  On one occasion, a plumber
was hired by Ms. Greer. After inspection of the work, Charles Moore refused to pay the
plumber.  David Moore hired a contractor of his choice to redo the work for substantially
more than what Ms. Greer's contractor charged.  Upon information and belief, that
contractor was paid out of the loan proceeds.

82.     Ms. Greer received bids for tree work. She hired a contractor to complete the job for $1,200. Charles Moore insisted that Ms. Greer use his contractor who had bid $2,000 for the job.

83.     Upon information and belief, Charles Moore hired the contractor to do the work, without Ms. Greer's permission.

84.     Ms. Greer did not sign Certificates of Completion relating to any of the work procured by Charles or David Moore, nor did she sign any of the checks used to pay contractors. She has no knowledge or information about what was paid to contractors and had no ability to control or determine how loan funds were used.

85.     Upon information and belief, Charles and David Moore have received kickbacks from contractors they use to do work on the subject property or the contractors were not actually paid the amount deducted from the escrow account .

86.     When questioned about his control over the loan proceeds, Charles Moore informed Ms. Greer that it was because he had been "beat out of his money too many times."

87.     Upon information and belief, Charles and David Moore retained most of the loan proceeds and exercise complete control and dominion over funds that ostensibly loaned to Julia Greer, making improvements on a home they fully expect to acquire through foreclosure. Given the appraisal value of the property and the amount of the loan, a large portion of which was paid by the Moores to themselves, they had reason to believe that they could acquire the improved property for less than half third of its actual value.

88.     David Moore has threatened to "cancel the agreement". Then, when Ms. Greer has asked why he was threatening her, he has said "I don't have to tell you anything."

89.     On or about August 1, 2007, David Moore contacted Julia Greer and informed her that he had arranged for the refinancing of the existing loan, and that the loan was ready to be closed. David Moore insisted that the closing occur at the office of Home Realty.

90.     Mr. Moore informed Ms. Greer that she must refinance because "he needs to get his money," and that the first loan was "not a long term loan."

91.     The closing of the second loan was scheduled to take place on August 8, 2007, at the office of Home Realty. On the Morning of August 8, 2007, Julia Greer received a call from Gerre Currie, the notary that had been hired by Yale Mortgage to close the loan. Ms. Currie informed Ms. Greer that she was at the property for the purpose of closing the loan. Ms. Greer met Ms. Currie at a nearby restaurant. After going over the loan documents, which were explained much more thoroughly by Ms. Currie than the original loan documents had been explained by Mr. Kern, Ms. Greer decided not to accept the new loan.

92.     Julia Greer, again, was not provided with a Good Faith Estimate or any other closing documents prior to the scheduled closing, as required by the Real Estate Settlement Procedures Act.

93.     The loan documents contain a fraudulently executed loan application.  Ms. Greer never signed a loan application for this loan. The signature that appears on the application is a forgery.

94.       The application fraudulently shows Ms. Greer's income as $2,800 per month and that she was self-employed at Greer Custom Drapery where she had worked for thirty-five years.  Ms. Greer is retired and only receives Social Security benefits in the amount of $814.00 per month

95.       The loan application also has an incorrect social security number, and wrongly states that Ms. Greer has four dependents and had completed twelve years of school.

96.       Ms. Greer has no dependents, has only a tenth grade education and has never been employed at Greer Custom Drapery; she worked as a grill cook at Baptist Hospital and does not even sew.  Upon information and belief, this information was a fraudulent statement made by the Moores to secure mortgage funds.

97.       According to the HUD-1 on the second loan, the principal amount of the new loan was to be $58,500.00.  It showed the payoff to Home Realty as $58,163.42 and called for a broker fee of $965.00 to Home Realty.  The principal indebtedness for the first loan was $50,000.

98.       The HUD-1 dated August 13, 2007, shows Yale Mortgage charging fees totaling $1,250.

99.       The HUD-1 also fraudulently shows that Ms. Greer paid $5,168.97 at closing.  She was not asked for or expected to pay any money at closing.

100.      The settlement charges on the second loan are $5,505.55, all of which was to be financed through loan proceeds, in violation of the Tennessee Home Loan Protection of 2006.

101.    The new loan was an Adjustable Rate Mortgage with an initial Annual Percentage Rate of 11.9%, and the first change scheduled for twelve months. The term of the proposed loan was thirty years and the interest rate could go as high as eighteen percent (18%) over the course of the loan.

102.    The initial monthly payment on the note, escrow included, is $817.25, which is $3.25 more than Ms. Greer's total monthly income of $814.00.

103.    The second loan offered to Ms. Greer with no regard to Ms. Greer's ability to repay, in violation of the express provisions of the Tennessee Home Loan Protection Act of 2006 and the federal Homeownership Equity Protection Act.

104.    Ms. Greer was not provided a 12-point bold face warning that she was about to enter a high-cost loan, which may be disadvantageous to her, in connection with the second loan,  in violation of the Tennessee Home Loan Protection Act of 2006.

105.    The fraud in the loan application and the settlement statements and oral statements made to Plaintiffs implicates all defendants who received funds, oversaw the closing, and/or prepared the closing documents, including but not limited to Home Realty, Home Financial Services of Memphis and Lawrence Kern.

106.    David Moore has contacted Julia Greer on several occasions following the proposed closing in August 2007. He has made many harassing calls and has threatened to foreclose on the property if Ms. Greer does not agree to consummate the second loan.

107.    Upon information and belief, the clients of Home Realty and Home Financial are largely or exclusively African-American based on the observations of Julia Greer during her many visits to their offices.

108.     Upon information and belief, Home Realty owns a substantial number of homes in the Memphis area, many of which it acquires through foreclosures, then rents or sells.

109.     Upon information and belief, the property inventory of Home Realty includes many properties which were security for loans made or brokered by Home Financial Services and subsequently acquired through foreclosure.

110.     Defendant Yale Mortgage also participated in the predatory lending scheme, benefiting by agreeing to purchase over-valued notes with high interest rates. Defendant Yale Mortgage would have had the power to collect on the debt or foreclose on the subject property if Ms. Greer had not had the opportunity to examine the documents and decided that she was not going to sign the new loan documents.

111.     Yale Mortgage's primary market is a subprime borrower who has significant equity in their homes and Yale bases approvals entirely on the equity in the property, rather than the borrower's ability to repay the loan.

112.     Yale Mortgage determined the manner in which the loan was to be made as well as the interest rate and other features present in the proposed loan.  These features are predatory in nature.

113.     Home Realty, Home Finance and Charles and David Moore and Yale Mortgage sought to increase the loan amount and thus increase their fees, charges and profits, and attempted to give Ms. Greer a larger loan than she needed or wanted.

114.     On September 13, 2007, Defendant Lawrence Kern, notified Ms. Greer of proceedings to foreclose on the home that Carrie Moore is currently living in.  A foreclosure sale is currently scheduled for October 9, 2007, at 12:00 noon.

115.     On October 8, 2007. the Commissioner of the Tennessee Department of Financial Institutions issued an Emergency Cease and Desist Order prohibiting Home Realty from initiating mortgage loans or initiating any foreclosure proceeding, because of its failure to comply with Tenn. Code Ann.§ 45-1-104 et seq.  (attached as Exhibit "A" to this Complaint).

# VII. <u>CAUSES OF ACTION</u>

## <u>COUNT I</u>

### <u>VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C.§ 1961 et seq. - ALL DEFENDANTS</u>

116.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint and allege that all Defendants, engaged in a predatory lending scheme and in an organized effort to engage Plaintiffs in illegal loans the purpose of which was to ultimately deprive Plaintiffs of their home, as set forth above, to their own benefit.  The RICO violations directly injured Plaintiffs by causing them to enter into predatory loans and risk the loss of their homes.  All defendants used the United States Mail and interstate telephone lines in furtherance of their actions as set forth above; and all Defendants engaged in a pattern of racketeering activity as defined in 18 U.S.C. §§ 1961-1968.

117.     Defendants, all of which are persons within the meaning of RICO, are employed by or associated with an enterprise whose activities engage in or affect interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C.§ 1962(c); to wit, multiple violations of 18 U.S.C. §§ 1341 and 1343.

118.     The members of the group have the same or similar purposes, results, participants, victims, methods of commission and are interrelated by distinguishing characteristics and are not isolated events.

119.      All Defendants violated 18 U.S.C. §1341 multiple times, having devised or intended to devise a scheme or artifice to defraud, or to obtaining money or property by means of false or fraudulent pretenses, representations, or promises. For the purpose

of executing such scheme or artifice or attempting to do so, all or some of the Defendants used the U.S. Mail or private or commercial interstate carriers in the furtherance of the Predatory Lending Scheme.

120.     All Defendants violated 18 U.S.C. § 1343 multiple times, having devised or intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds, for the purpose of executing such scheme or artifice.

121.     The multiple violations of 18 U.S.C. §§ 1341, 1343 constitute racketeering activity pursuant to 18 U.S.C. § 1961 and were integral part of and essential to the success of the Predatory Lending Scheme.

122.     All Defendants knew the Predatory Lending Scheme could not have succeeded and/or continued without (I) mailing, providing, or transmitting or causing the mailing, providing, or transmitting of fraudulent loan information among various Defendants and Plaintiffs; and (ii) funds necessary to fund the loans being wired directly to the closing attorneys from interstate financial institutions; thereby enabling the funding of subsequent loans involved in Defendants' Predatory Lending Scheme.

123.     The facts demonstrate that Defendants formed an association-in-fact.

124.     The associated persons formed an ongoing organization, formal or informal, concerning the RICO Enterprise, and the various associates functioned as a continuing unit of the RICO Enterprise, and the RICO Enterprise exists separate and apart from the predicate activities themselves. The facts in the case demonstrate the

existence of an association-in-fact RICO enterprise by showing that the enterprise has a certain amount of organizational structure or some sort of chain of command.

125.     Defendants Charles and David Moore acting as agents for Home Realty and Home Financial are at the heart of the RICO enterprise. Their role as facilitators is crucial to the success of the enterprise. The scheme begins when Home Realty or Home Financial approach or are approached by potential borrowers. Charles or David Moore then inspect the property in order to ascertain its value. Once it is determined that the property has substantial equity, Home Financial or Home Realty agree to loan money to the consumer. Defendants fully expect the consumers with limited income to fail in their obligations on the loan. The loans are made for substantially less than the value of the property; this insures that the defendants can make a substantial profit when purchasing the house in a foreclosure sale.

126.     After the loan is made, the Moores take control of the loan proceeds in order to insure that a substantial profit is made after purchasing the property in a foreclosure sale. By exercising complete control over the loan proceeds, the Moores are essentially loaning money to themselves to make improvements on property which they will or may acquire.

127.     Home Realty employs Lawrence Kern to close the loans made in furtherance of this enterprise. Upon information and belief, Kern rushes the consumer through the closing transaction, fails to provide statutorily required disclosures, sets up the escrow account used to fund the enterprise and provides false or misleading information to the borrower.

128.     Upon information and belief, these loans are made for the sole purpose of foreclosure or forcing the consumer into refinancing the loan through Home Reality, Home Financial, or one of their affiliates.

129.     The loans that are not foreclosed on by Home Realty and Home Financial are refinanced through their affiliates. Yale Mortgage is a crucial member of this predatory lending enterprise.

130.     By making a short-term interest only loan and then an extremely unconscionable long term loan, these defendants have sought to lock an unwary consumer into a situation in which they must accept the unconsionable second loan, or face foreclosure and loss of the home in which the have substantial equity. A side benefit of the two loan scheme is that the Moores double their outrageous fees and charges by claiming fees for each transaction. Yale Mortgage benefits of will benefit because the fees paid to the other defendants are financed through the loan, so the principal amount of the new loan is greatly increased by the fees associated with the previous loan.

131.     Yale Mortgage's primary market is a subprime borrower with significant equity in their homes. Yale Mortgage bases approval of loans entirely on the equity in the property. Yale Mortgage benefits greatly from the original loan to the consumers because it forces the consumer to refinance in a short amount of time with the lender of Home Realty or Home Financial's choosing.

132.     False loan applications are prepared by David Moore, and accepted by Yale mortgage. Upon information and belief, these loan applications are transmitted through the U.S. Mail and or interstate telephone lines.

## COUNT II

## VIOLATION OF THE FAIR HOUSING ACT

133.    The Plaintiffs incorporate by reference the preceding paragraphs of this complaint and allege that all Defendants were involved in a scheme that intentionally targeted Plaintiffs as African-Americans as well as, upon information and belief, numerous other African-American individuals with fraudulent loan practices that are designed to eventually take away their homes. All Defendants have violated 42 U.S.C. §3601 et. seq.

134.    Specifically, all Defendants have violated the Fair Housing Act by making housing unavailable to African Americans by subjecting them to discriminatory terms and conditions on loans that they neither want nor need, thereby reducing their ability to use and enjoy housing.  Defendants have carried out their discriminatory scheme through a series of predatory practices designed to deprive African Americans of the use, enjoyment, and ultimately ownership of their homes.

135.    The predatory lending scheme violates the Fair Housing Act by intentionally targeting African Americans for fraudulent loan practices that are designed to collect excessive fees and to take away homes. Upon information and belief, the vast majority of consumers who have obtained loans from these defendants are African American. The Plaintiffs and other African-Americans with similar loans from these Defendants have been subjected to the practices herein described because of their race.

136.    On numerous trips to the offices of Home Realty and Home Financial all of the customers or clients that Julia Greer observed were African American and Ms. Greer is aware of at least one other African American family that lost property through

foreclosure as a result of loan transactions with these defendants, similar to those of issue in this complaint.

137.     Moreover, Charles and David Moore made statements to Julia Greer that exhibited racial animus and portrayed African-Americans in negative stereotypes.

138.     With respect to Plaintiffs' dwelling, the Defendants discriminated against the Plaintiffs in the terms and conditions of the mortgage loan and in the provision of services in connection therewith because the Plaintiffs are African American. Specifically Plaintiffs were denied access to or control over the loan proceeds because of their race. Plaintiffs were given a loan that Defendants knew they would be unable to repay. Furthermore, the loan was made with the intention of either foreclosing on the property or forcing Plaintiffs into refinancing the loan at terms that were greatly beneficial to defendants.

## COUNT III

## VIOLATION OF THE TRUTH IN LENDING ACT

139.     The Plaintiffs incorporate by reference the preceding paragraphs of this Complaint and allege that Home Realty and Yale Mortgage have violated the provisions of the Consumer Credit Protection Act or Truth-In-Lending Act, 15 U.S.C. 1601, et seq., and Regulation Z which implements the Truth-In-Lending Act, 12 C.F.R. 226, et seq. Specifically, among others, the Defendants violated these provisions by failing to provide information to the borrower.

140.     In the course of this consumer credit transaction, the Defendants violated 15 U.S.C. §1635(a) and §1639(a) and 12 CFR §226.17, §226.23(b), and §226.32 by failing to deliver to Plaintiffs the enhanced disclosures required pursuant thereto.

Furthermore, the Defendants fraudulently concealed their violations by waiting until closing to provide any disclosures, burying the disclosures in a barrage of papers, covering documents so that they could not be read, and failing to explain the documents to an uneducated consumer.

141.    The consumer credit transaction is subject to the Plaintiff's right of rescission as provided for in 18 U.S.C. §1635 and 12 CFR §226.23, and further governed by 15 U.S.C. §1639(a) and 12 CFR §226.32.

142.    Plaintiff Julia Greer has attempted to exercise her right to rescind the loan. Defendants have fraudulently and illegally refused to rescind the loan transaction, informing Plaintiff that she must pay them the fees that they stood to earn on the loan before they would rescind it.

143.    Pursuant to 15 U.S.C. §1635, Plaintiffs have a continuing right to rescind the consumer credit transaction for up to three years after its consummation.

144.    Defendants have failed to take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.

145.    Defendants have further failed to return to the Plaintiffs any money or property given by Plaintiffs to anyone, including the Defendants, as required by 15 U.S.C. §1635(b) and 12 CFR §226.23(d)(2).

146.    As a result of the aforesaid violations of the federal Truth in Lending Act and applicable regulations, Defendants are liable to Plaintiffs for rescission of these transactions, pursuant to 15 U.S.C. §1635 and §1640, including, without limitation, termination of any security interest in Plaintiffs' property created under this transaction, return of any money or property given by the Plaintiffs to anyone, including Defendants,

enhanced damages equal to the sum of all finance charges and fees paid by Plaintiffs pursuant to 15 U.S.C. §1640(a)(4), and actual damages in an amount to be determined at trial.

## COUNT IV

## VIOLATION OF THE HOME OWNERSHIP AND EQUITY PROTECTION ACT

147.    The loan from Defendant Home Realty is subject to the Home Ownership and Equity Protection Act (HOEPA), 15 U.S.C. §1639. The loan triggers HOEPA protections because the points and fees charged on the loan exceed eight percent (8%) of the total loan amount and exceed four hundred dollars ($400.00). Defendant Home Realty was paid a two thousand five hundred dollar ($2,500.00) loan discount fee from the loan proceeds and defendant Home Financial was paid a two thousand five hundred dollar ($2,500.00) loan origination fee from the loan proceeds. Together this totals ten percent (10%) of the total loan amount.  In addition, the loan contains a two thousand ($2,000.00) fee to Home Realty at maturity if the loan is not refinanced though Yale Mortgage.

148.    The Defendants violated 15 U.S.C. §1639(a) by not providing the required additional disclosures at least three business days prior to closing.

149.    The loan contains a balloon payment which is a direct violation of 15 U.S.C. §1639(e).

150.    The Defendants violated 15 U.S.C. 1639(h) by making a loan without regard for the Plaintiffs' ability to repay. Home Reality loaned money to Ms. Greer based solely on the value of the property, not taking into account her income or ability to make payments.

## COUNT V

## VIOATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT

151.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint and alleges that all Defendants have violated or conspired to violate the provisions of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. 2601, et seq., and Regulation X which implements RESPA, 24 C.F.R. § 3500, et seq.

152.     Specifically, the Defendants have violated these provisions, among others, by failing to provide the Plaintiffs with a proper "Good Faith Estimate" of the amount or range of settlement charges prior to closing (12 U.S.C. § 2604(c) and 24 C.F.R. § 3500.7), and by charging excessive or unearned fees (12 U.S.C 1607 (b)).  Furthermore, Defendants conspired to receive referral fees, or kickbacks, and split fees in violation of 12 U.S.C. 2607 (a) and (b).  Defendants Home Reality and Home Financial were both paid two thousand five hundred dollars ($2,500.00) for originating the loan. Upon information and belief Home Realty and Home Financial are owned and operated by the same individuals. Upon information and belief Home Realty and Home Financial share the same employees. Defendants also fraudulently concealed their violations.

## COUNT VI

## VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT

153.     Plaintiffs incorporates by reference the preceding paragraphs of this Complaint and alleges that Defendants violated the provisions of the Equal Credit Opportunity Act (ECOA), 15 U.S.C. §1691, et seq.

154.     The Defendants discriminated against the Plaintiffs, with respect to every aspect of the credit transactions, on the basis of race.

155.     The Defendants did not extend credit upon the terms requested by the Plaintiffs, nor did they provide any notification of their terms of credit as required by the Act.  The Plaintiffs sought a home repair loan at no time prior to the transaction were Plaintiffs informed that the lender would retain control over the loan proceeds.

156.     Defendants discriminated against the Plaintiffs by not allowing them to make use of the loan proceeds from the credit transaction.

157.     Defendants further discriminated against Plaintiffs in respect to the terms of the loan. Plaintiffs requested a conventional home repair loan. Plaintiffs were given a six month loan at an exorbitant interest rate with a balloon payment and terms intended to force them to refinance the loan through Home Realty, Home Finance, or one of their affiliates.

## COUNT VII.

### VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT

158.     Plaintiffs incorporates by reference the preceding paragraphs of this Complaint and alleges that in committing the enumerated acts complained of, all Defendants have engaged in numerous fraudulent and/or deceptive business practices toward Plaintiffs and have thereby violated the provisions of the Tennessee Consumer Protection Act, T.C.A. § 47-18-101, et seq., resulting in damages to the Plaintiffs.

## COUNT VIII.

### VIOLATION OF THE TENNESSEE HOME LOAN PROTECTION ACT

159.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint. Plaintiffs allege that Defendants have violated and attempted to violate the Tennessee Home Loan Protection Act T.C.A. §45-20-103 et. seq.  The loan from Home

Realty was a High-Cost loan as defined by the act. The act defines a High-Cost loan as one in which the points and fees exceed five percent (5%) of the total loan amount for loans of more than thirty thousand dollars ($30,000.00). The Home Realty loan contained points and fees that totaled more than ten percent (10%) of the total loan amount.

160.     The original loan is not amortized through the life of the loan and contains a balloon payment prohibited by the act. The Defendants did not provide appropriate disclosures as required by the act. Furthermore, the Defendants have made loans and conspired to make loans with no regard as to the Plaintiffs' ability to repay and have financed fees and charges totaling well over three percent (3%) of the loan amount through the proceeds of the loan. The Defendants have also initiated foreclosure without providing notice as required by the act.

**COUNT IX.**

**FRAUD**

161.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint and allege that in committing the enumerated acts complained of, all Defendants made false representations of existing or past material facts; that such false representations were made knowingly, without belief in their truth, or recklessly; and that Plaintiffs reasonably relied upon them and thereby suffered damages as a result of such reliance. Home Realty, Home Financial and their representatives overtly and repeatedly made false representations to the Plaintiffs as delineated above.  Defendant Lawrence Kern made false representations by informing the Plaintiffs that the settlement charges to Home Realty and Home Financial were correct and in order and by misleading Julia Greer as to her right to rescind the transaction pursuant to the Truth In Lending Act.

162.     Plaintiffs innocently relied on the misrepresentations and consummated the loan to their detriment.

163.     Had the Plaintiffs known the truth about the terms and conditions of the loan and repairs, they would not have entered into the agreement.

164.     Defendant Kern further made false representations when he informed Ms. Greer that she would have to pay more than $12,000 in order to rescind the loan. Defendant David Moore made fraudulent representation by informing Ms Greer that she would have to pay $24,200.36 in order to rescind the loan.

165.     Plaintiff innocently relied on the misrepresentations and did not exercise her right of rescission.

166.     Had the Plaintiff known the truth about her right of rescission, she would have rescinded the loan.

## COUNT X

## CONVERSION - ALL DEFENDANTS

167.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint and allege that each Defendant unlawfully took and/or converted to his/her/its own use certain property of Plaintiff, to wit: loan proceeds on the subject property and fees from the loan.

## COUNT XI

## NEGLIGENT MISREPRESENTATION

168.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint and allege that Defendants had a duty of due care to Plaintiffs and that the Defendants breached such duty to Plaintiffs by omitting or misrepresenting material

information to Plaintiffs.  The negligent misrepresentation of Defendants was the proximate cause of damages suffered by Plaintiffs.

169.    The Defendants were acting in the course of business or in transactions involving pecuniary interest.

170.    The Defendants, provided faulty information to the Plaintiffs that was meant to guide the Plaintiffs through the transaction.

171.    The Defendants failed to exercise reasonable care in obtaining and communicating information.

172.    The Plaintiffs justifiably relied on the faulty information from the Defendants to their detriment.

## COUNT XII

## UNCONSCIONABILITY

173.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.  At all times pertinent to this action, Defendants Home Realty and Home Financial were merchants within the meaning of T.C.A. §47-2-104(1), dealing in goods of the kind involved in the present case.

174.    Each of the Defendants has extensive experience and sophistication in transactions such as this.

175.    Conversely, the Plaintiffs have no experience in contracting for a home improvement loan and are entirely inexperienced and unsophisticated in matters involving consumer lending.

176.    In light of the disparity in the commercial background and needs of the

parties, the excessively high fee, high interest mortgage agreement in which strict control of the proceeds was exercised by the lender was unconscionable.

177.     The fees charged by Home Services and Home Financial were unconscionable as of the time the contract was made. For example, Tennessee Department of Financial Institutions regulations provide that a broker's fee in excess of two percent (2%) is excessive. The Plaintiffs were charged fees of ten percent (10%).

178.     Pursuant to T.C.A. §47-2-302, the Court may act to refuse to enforce said contract or may enforce or limit the application of any unconscionable clause so as to avoid any unconscionable result, and should therefore act to modify the contract so as to entitle the Plaintiffs to a refund of all amounts paid in excess of the fair and reasonable value of the goods provided and work performed to install the goods.


### VIII.  REQUESTS FOR RELIEF

**WHEREFORE PREMISES CONSIDERED**, Plaintiffs requests the following relief:

1.     Issuance of a Preliminary and Permanent Injunction restraining and enjoining Defendants, directly or indirectly, and their agents and/or servants, or anyone in concert with them, from: selling, transferring, and divesting the subject property (unless proceeds go to Plaintiffs as partial payment for damages); pledging the property as collateral or security for any additional loans.

2.     That a Temporary Restraining Order and/or Preliminary Injunction be issued enjoining Home Realty, its agents, servants, employees, or assigns from taking any action to foreclose the property that is the subject of this lawsuit.

3.      That a jury be empanelled to hear the issues in this case pursuant to Rule 38 of the Federal Rules of Civil Procedure and 42 U.S.C.§ 1981a (c) (1).

4.      That Plaintiffs be granted a judgment for injunctive relief and monetary damages in the amount to be proven at trial against Defendants.

5.      That Plaintiffs be awarded treble damages pursuant to the Tennessee Consumer Protection Act and 18 U.S.C. § 1964(c).

6.      That Plaintiffs be awarded actual and statutory damages against the Defendants for violations of the Truth-In-Lending Act and Regulation Z.

7.      That Plaintiffs be awarded actual and treble damages against the Defendants for violations of RESPA and Regulation X.

8.      That Plaintiffs be awarded actual and punitive damages for violation of the ECOA.

9.      That Plaintiffs be awarded actual and punitive damages for violation of the Tennessee Home Loan Protection Act.

10.     In the alternative to treble damages, that punitive damages be awarded in an amount to be determined at trial.

11.     That Plaintiffs be awarded both pecuniary and non pecuniary damages and punitive damages for the Defendant's violation of the Fair Housing Act.

12.     Disgorgement of any profits and benefits received or obtained by Defendants.

All such other relief, both equitable and legal, to which Plaintiffs is entitled and that is deemed appropriate by the Court.

Date:  October 8, 2007

Respectfully submitted,

s/Sapna V. Raj

_____
Webb A. Brewer, BPR #9030
Sapna V. Raj, BPR # 19679
Tim O. Wilson Jr., BPR # 25764
Attorneys for Plaintiffs
Memphis Area Legal Services, Inc
Memphis Fair Housing Center
109 North Main Street, 2nd Floor
Memphis, TN   38103
(901) 523-8822

.